EDWIN A. LOMBARD, Judge.
_JjThe defendant, Ausbia Taylor, appeals his conviction and life sentence for second degree murder. After review of the record for errors patent, we affirm the defendant’s conviction, remand the case to the district court for a ruling on his motion for reconsideration of sentence, and grant the motion to withdraw filed by counsel for the defendant.

Relevant Facts and Procedural History

On June 5, 2008, John Jordan was shot and killed at the corner of Annunciation and Richard Streets. On November 6, 2008, the defendant was charged with the second degree murder of John Jordan. He pleaded not guilty to the charge at his arraignment on December 1, 2008. After the case was repeatedly reset due to the absence of counsel, the court appointed new counsel to represent the defendant and, finally, in January 2010, his motion to suppress the identification was heard and denied. On May 11, 2010, he was found guilty as charged by a twelve-person jury. On May 28, 2010, the defendant’s motion for a new trial was denied and the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. The district court granted his motion for appeal but failed to rule on his motion to reconsider sentence. | ¡¡Although the defendant indicated that he intended to file a pro se brief and was provided with a copy of the record, he has not filed a pro se brief. The defendant’s counsel filed a brief requesting a review of the record for errors patent and a motion to withdraw.
A review of the record reveals that at trial the parties stipulated that the victim sustained four gunshot wounds, including one to the back of his head.
The victim’s mother, Diane Jordan, testified that at the time of John’s murder both John and his brother, Travis, lived with her. On the morning of June 5, 2008, John and Travis left the house to take John’s three young daughters to a nursery school at Kingsley House. Shortly thereafter, she received a call from Travis and went to the hospital where John had been taken. John died five days later.
Officer Lorenzo Black of the New Orleans Police Department (NOPD) witnessed the shooting. He testified that he was sitting at a traffic light on Annunciation Street at approximately 8:00 a.m. when he saw a small white car pull up and park on the opposite side of the street, against traffic. Two African-American *345 men, one dressed all in black and the other in a white t-shirt and dark shorts, got out of the car. Shortly thereafter, a blue Suburban came around the corner from Richard Street and both of the men from the white car pulled guns and started shooting at the Suburban. The Suburban hit a utility pole and then ran into a warehouse. Officer Black called in a report of the shooting and drove after the shooters, who fled down Richard. As Officer Black turned onto Richard, he saw the man in the white t-shirt running down the street. He also saw a man who was dressed all in black, but that man was merely walking on the street. Officer Black pursued the man in the white t-shirt and observed him drop a gun as he ran. The |sman then ran through a gate into a vacant lot at Constance Street. At that point, Officer Black was less than the length of a car’s hood from the man, who turned and looked back at Officer Black before running further into the lot. Officer Black drove into the lot after the man, but the man ran behind a dirt mound, where Officer Black’s car could not follow. Officer Black saw the man jump a fence and backed out of the lot in an attempt to follow, but lost sight of the man. Other police units arrived and secured the scene and Officer Black called for emergency medical assistance for the people in the Suburban. Later that same day, Officer Black viewed a lineup from which he chose a photo of Ausbia Taylor as one of the men whom he saw shooting at the Suburban and whom he chased into the vacant lot.
Jennifer Day testified that on the morning of the shooting, she was getting ready for work when she heard gunshots. She looked out a window and saw activity at the corner of Annunciation and Richard Streets. She looked for her phone to call 911, and when she looked back out the window, she saw a man in a white t-shirt and black shorts running through an empty lot from Richard Street toward Orange Street. She estimated that she saw the man approximately thirty seconds after she heard the gunshots.
Officer James Alexander of the NOPD was familiar with the defendant prior to the murder. At approximately 7:00 on the morning of the murder, he saw the defendant and another man whom he did not know driving in a white car in uptown New Orleans. Officer Alexander took note of the car’s license plate number, intending to run it later. Officer Alexander later gave this information to the police officer in charge of the murder investigation, Detective Matthew McCleary. Officer Alexander viewed a photograph of the white car that the perpetrators drove 14to the area of the shooting and testified that the car in the photograph was similar to the car he saw the defendant in on the morning of the shooting.
Detective McCleary identified several photographs taken of the murder scene as well as two guns, a Beretta and a Cobra 380, which were found in the area. He testified that he viewed videotapes of the shooting that came from security cameras at Kingsley House which is located at Annunciation and Richard Streets. The police also towed the white Toyota Corolla that the shooters drove to the murder scene and searched it after obtaining a search warrant. After speaking with Officer Alexander, Detective McCleary developed the defendant and Demond Morris as suspects in the murder. He compiled two photographic lineups, each containing one of the suspects and showed them later that day to Officer Black. Officer Black identified the defendant from one lineup but was unable to identify anyone in the second lineup. The defendant was subsequently arrested pursuant to an arrest warrant *346 obtained by Detective McCleary.[1]
The parties stipulated that a latent fingerprint lifted from the Toyota did not match either the defendant’s or Morris’ fingerprints. They also stipulated that bullets recovered during the victim’s autopsy were fired from the Beretta and the Cobra found near the scene.

Discussion

By his sole assignment of error, the defendant requests a review of the record for errors patent. As required by State v. Jyles, 96-2669 (La.12/12/97), 704 So.2d 241, counsel’s brief includes not only the procedural history and the evidence presented at trial but also “a detailed and reviewable assessment ... of [^whether the appeal is worth pursuing in the first place.” Id. Counsel’s detailed review of the procedural history of the case and the facts of the case indicate a thorough review of the record. Counsel moves to withdraw because she believes, after a conscientious review of the record, that there is no non-frivolous issue for appeal. Counsel reviewed the record and found no trial court ruling that arguably supports the appeal. A copy of counsel’s brief was forwarded to the defendant and this court informed him that he had the right to file a brief in his own behalf. He has not done so. Thus, this Court’s review is limited to errors on the face of the record. La. Code Crim. Proc. art. 920.
As per State v. Benjamin, 573 So.2d 528 (La.App. 4 Cir.1990), we have performed an independent, thorough review of the pleadings, minute entries, and the bill of information in the appeal record. The defendant was properly charged by bill of indictment with second degree murder in violation of La.Rev.Stat. 14:30.1 and the bill of indictment was signed by the foreman of the grand jury. The defendant was present and represented by counsel at arraignment, during trial, and at sentencing. The jury’s verdict and the defendant’s sentence are legal in all respects. Furthermore, a review of the trial transcript shows that the State provided sufficient evidence to prove beyond a reasonable doubt that the defendant was guilty of second degree murder, as found by the jury. Nonetheless, we note one patent error. The trial court received but did not rule on Taylor’s motion for reconsideration of sentence. While the failure to rule on a motion to reconsider sentence would preclude review of a defendant’s sentence, see State v. McQun, 2002-0259 (La.App. 4 Cir. 6/19/02), 828 So.2d 598, the defendant does not seek preview of his sentence. Thus, although the case must be remanded for a ruling on the motion to reconsider sentence, see State v. Peters, 2010-0326 (La.App. 4 Cir. 2/16/11), 60 So.3d 672, the failure to rule on the motion to reconsider sentence does not preclude review of the defendant’s conviction.

Conclusion

Our independent review reveals no non-frivolous issue and no trial court ruling that arguably supports an appeal. Therefore, we affirm the defendant’s conviction and remand the case to the trial court for a ruling on the defendant’s motion to reconsider sentence, reserving his right to appeal his sentence once the court has ruled. The appellate counsel’s motion to withdraw is granted.
CONVICTION AFFIRMED; MOTION GRANTED; REMANDED.

. Mel Ryan, an investigator for the district attorney, testified that he obtained driver’s license photographs for the owners of the Toyota left on the scene. Neither of these owners was Taylor or Morris.